**Alfredrick LOVE, Petitioner,**

v.

**L.E. SCRIBNER, Warden, Respondent.**

Case No. 06cv640–WQH–RBB.

United States District Court,
S.D. California.

Feb. 18, 2010.

James Fife, Federal Defenders of San Diego, San Diego, CA, for Petitioner.

## ORDER

HAYES, District Judge:

The matter before the Court is the Report and Recommendation (Doc. # 55) of Magistrate Judge Ruben B. Brooks, filed on November 30, 2009, recommending that the Court grant Petitioner Alfredrick Love's Petition for Writ of Habeas Corpus (Doc. # 1), unless Love is retried within a reasonable period of time.

### BACKGROUND

In July of 2003, Love, an African–American, was tried and convicted in state court of battery on a non-confined person by a prisoner. During jury selection, after consideration of hardships, only one remaining venire-member was African–American, Gloria McGee. During the second day of jury selection, July 21, 2003, Assistant District Attorney Eric Baker exercised a peremptory challenge to excuse McGee from the jury panel.

Love made a timely objection to the prosecution's excusing McGee, arguing that the prosecution's peremptory challenge was racially motivated. The prosecution stated that McGee was excused because:

> she's a social worker and eligibility worker. I excused both of those that I believed to be that. That is a personal—my personal jury selection. Teachers and social workers don't sit on the jury. I referred to Chris Kowalski's notes who was in original voir dire. It appears she was an eligibility worker. They are not favorable jurors to the prosecution.

(Jt. Mot. to File Copy of Trans. at 371–72, Doc. # 45).[1] Love responded by saying that,

---

1. Baker was not present during the first day of jury selection, when McGee was questioned

From my notes, she's not a teacher and social worker. The only thing about her background has been law enforcement, which makes it seem—conventionally she would be leaning toward the District Attorney. The only thing I can see that you would possibly dismiss her for is that she's African/American.

*Id.* at 372.[2]

The state trial court denied Love's challenge to the prosecution's use of its peremptory challenge on the grounds that Love did not make out a prima facie case of purposeful discrimination because Love was unable to show a "pattern" of racially motivated peremptory strikes. *Id.* Alternatively, the trial court denied Love's challenge on the grounds that the prosecution stated a reasonable race-neutral explanation for excusing the lone remaining African–American member of the jury pool. *Id.* at 372–73.

On June 16, 2004, Love filed an appeal, arguing that he was entitled to a new trial based upon the prosecution's racially motivated use of a peremptory challenge. On February 2, 2005, the California Court of Appeal affirmed the conviction.

On March 22, 2006, Love filed a Petition for Writ of Habeas Corpus in this Court. (Doc. # 1). On September 7, 2006, the Magistrate Judge issued a report and recommendation recommending that Love's Petition be denied. (Doc. # 11). On January 19, 2007, 2007 WL 173895, this Court adopted the report and recommendation and ordered judgment to be entered. (Doc. # 15).

On March 19, 2008, 278 Fed.Appx. 714, the Ninth Circuit reversed the judgment. (Doc. # 25). The Ninth Circuit stated:

Because the California Court of Appeal 'unreasonabl[y] appli[ed] . . . clearly established Federal Law,' 28 U.S.C. § 2254(d)(1), with respect to the comparative analysis, the inquiry into whether the prosecutor's reason for rejecting the black juror was pretextual must be determined *de novo* on federal habeas.

The dissent maintains that we can determine on the current record that there was no pretext, because the prosecutor did strike all the social workers, although not all the teachers. This analysis repeats the error of the California Court of Appeal. The prosecutor's stated reason applied to both teachers and social workers. . . . [W]here, as here, the prosecutor's stated reason does not hold up, '[i]ts retextual significance does not fade,' *Miller–El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), because an appellate judge, looking at the record, can construct a different rationale, here an antipathy toward social workers but not teachers.

The record, as it stands, does not provide an adequate basis for determining *de novo* whether the real reason the prosecutor struck Ms. M. was her race. The [state] trial court did not allow Love to examine the prosecutor's actual reasons for keeping teaching-connected individuals, while striking Ms. M. from the jury. . . .

Under the circumstances, the appropriate remedy is a remand for an evidentiary hearing.

We therefore reverse and remand for an evidentiary hearing to determine whether the prosecution struck Ms. M.

---

by the original prosecutor, Kowalski. On day two of jury selection, Kowalski was unavailable due to illness, and Baker replaced him. (Jt. Mot. to File Copy of Trans. at 347, Doc. # 45).

2. During voir dire, McGee stated that her brother-in-law was a correctional officer at Calipatria State Prison and her sister was a supervisor in the records section of the sheriff's department. *Id.* at 275.

from the jury because of her race. If, on remand, the district court finds discrimination, the petition shall be granted. If, however, the district court finds no discrimination, the judgment denying the petition shall be reinstated.

*Love v. Scribner,* 278 Fed.Appx. 714, 718 (9th Cir.2008) (citations omitted).

On July 14, 2008, this Court referred the case to the Magistrate Judge following remand from the Ninth Circuit. (Doc. # 28). On March 12, 2009, the Magistrate Judge conducted an evidentiary hearing, at which two witnesses testified: Baker and Love. (Doc. # 43, 44–1).

On November 30, 2009, the Magistrate Judge issued the Report and Recommendation. (Doc. # 55).

## A. Report and Recommendation
### 1. Motion to Strike Petitioner's Exhibit B

Petitioner attached a transcript of a December 2008 interview of Baker as Exhibit B to Petitioner's post-evidentiary-hearing brief. (Doc. # 48). The interview was conducted by Respondent's counsel, and a transcript of the interview was prepared and provided to Petitioner's counsel. At the evidentiary hearing, neither counsel for Petitioner nor counsel for Respondent sought to introduce the interview transcript into evidence, although both referred to the prior interview.

The Magistrate Judge granted Respondent's motion to strike the transcript. (Doc. # 55 at 17–22). The Magistrate Judge stated:

Petitioner was not diligent in seeking to expand the record after the close of evidence. The Baker interview transcript is not the type of post-evidentiary

hearing material for which Rule 7 [of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254] is suited. The interview was tape recorded and does not appear to have been given under oath. The transcript is not signed, was not reviewed, and the question-and-answer session took place long after the filing of Love's habeas Petition. The content of the interview is not especially important or probative and does little to 'clarify the relevant facts.'

(Doc. # 55 at 22 (quoting *Vasquez v. Hillery,* 474 U.S. 254, 258, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986))).

### 2. *Batson* [3] Challenge

In the Report and Recommendation, the Magistrate Judge analyzed Love's *Batson* challenge at length, and concluded:

Baker's categorical explanation for striking McGee—teachers and ˙ social workers don't sit on the jury—was not consistently applied. He challenged McGee but permitted non-African-Americans [who were teachers or had a teaching-related occupation] to serve on the jury. Alternatively, if being a teacher or social worker was only one of many factors the prosecutor generally considered, Baker was unable to articulate any additional reasons he had for challenging McGee. He did not identify any of his guidelines as the actual reason for challenging her or not challenging others. The prosecutor simply did not recall what he had done five and one-half years earlier. In Love's case, additional reasons did not come from Baker, but from Respondent's counsel. Her speculation is not entitled to any weight. The

---

**3.** In *Batson v. Kentucky,* 476 U.S. 79, 85–88, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth

Amendment prohibits a prosecutor from purposefully excluding potential jurors on the basis of racial identity.

evidence indicates that the peremptory strike was racially motivated.

On July 21, 2003, Baker struck the only African–American seated on the jury to try this African–American defendant. Love has proven, by a preponderance of the evidence, that the prosecutor did not strike McGee from the jury simply because she was an eligibility worker. The circumstances of that peremptory strike, Baker's inability to articulate a credible explanation for the strike, and a comparative analysis of McGee and jurors who were permitted to serve are sufficient to conclude that Baker used a peremptory challenge to eliminate McGee from the jury because she was African–American. The prosecutor's strike violated the Equal Protection Clause as described in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Court recommends that unless Love is retried within a reasonable period to be set by the district court, his Petition for Writ of Habeas Corpus be GRANTED.

(Doc. # 55 at 47–48).

### B. Objections to the Report and Recommendation

On December 17, 2009, Respondent filed objections to the Report and Recommendation (Doc. # 57), and on December 18, 2009, Petitioner filed objections to the Report and Recommendation (Doc. # 58). On January 8, 2010, Petitioner filed a reply to Respondent's objections. (Doc. # 59).

#### 1. Respondent's Objections

Respondent summarized his objections as follows:

First, the Magistrate Judge ignored the circumstantial evidence presented regarding the prosecutor's motives. The prosecutor testified to the characteristics he was looking for in Petitioner's jury. He testified regarding the types of jurors he favored and disfavored at the time and stated that he applied those standards and preferences while selecting Petitioner's jury. The Magistrate Judge ignored this testimony and categorized it as the prosecutor's or Respondents counsel's speculation. There is nothing speculative about testifying to one's habit and practices. There is no legal cause for disregarding the prosecutor's testimony regarding the practices he applied during Petitioner's trial.

Additionally, the Magistrate Judge found the state had an obligation to present the prosecutor's actual reasons for retaining each of the teaching-connected jurors that formed the basis of the court's comparative juror analysis. Although the state has a burden to present the prosecutor's actual reason for striking the minority juror and a failure to meet that burden constitutes evidence of discrimination, there is no burden to present the prosecutor's actual reasons for retaining all of the jurors who remain on the jury. The Magistrate Judge improperly imposed a burden on the state where none exists and then found evidence of discrimination in the state's perceived inability to meet that burden.

In so doing, the Magistrate Judge failed to conduct a true comparative juror analysis. The Magistrate Judge did not conduct a side-by-side comparison of the minority juror who was removed and the non-minority jurors who remained on the jury. The Magistrate Judge failed to address the dissimilarities between the jurors or explain how the prosecutor's decision to retain the non-minority jurors was probative of his motive to strike the minority juror despite the considerable differences between the jurors. Rather, the Magistrate Judge inferred discrimination strictly from the prosecutor's inability to recall the jurors or provide direct testimony regarding

why he chose to keep them on the jury. A true comparative juror analysis reveals that no similarly-situated jurors remained on the jury. Petitioner has failed to meet his burden to show purposeful race discrimination, and this Court must deny his Petition with prejudice.

(Doc. # 57 at 1–2).

Petitioner filed a reply, contending that "Respondent mischaracterizes mere insufficient evidence supporting his theories as assigning a burden of proof" (Doc. # 59 at 4), and "Respondent's critique of the comparative analysis is meritless and grounded on incorrect factual assertions" (Doc. # 59 at 5).

### 2. Petitioner's Objections

Petitioner "accepts Judge Brooks's ultimate conclusion and recommendation, but he objects to specific findings and rulings in the R & R.... [Petitioner] ... requests the Court reject those portions, but otherwise adopt the R & R in full." (Doc. # 58 at 1). Petitioner contends that "this Court should reject the [Magistrate Judge's] legal conclusion that an expansive definition of 'teacher' is not required by the law of the case." (Doc. # 58 at 2). Petitioner objects to the Magistrate Judge's granting of Respondent's motion to strike the transcript of the December 2008 interview of Baker. Petitioner contends that the Magistrate Judge erroneously assigned little weight to Petitioner's arguments concerning venire-member Ramirez, and Baker's exercising of his first peremptory challenge against McGee. Finally, Petitioner requests that the Court make two "corrections and clarifications" to the Report and Recommendation.

### STANDARD OF REVIEW

The duties of the district court in connection with a magistrate judge's report and recommendation are set forth in Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court must "make a *de novo* determination of those portions of the report ... to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *see also United States v. Remsing*, 874 F.2d 614, 617 (9th Cir.1989).

### DISCUSSION

The Court has considered all objections filed by the parties and reviewed *de novo* all portions of the Report and Recommendation. In the Report and Recommendation, the Magistrate Judge set forth the correct legal standards and undertook " 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,' " including "a comparative analysis of similarly situated jurors." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008) (quoting *Batson*, 476 U.S. at 93, 106 S.Ct. 1712); *see also Miller–El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."). After considering all of the available evidence, and giving due weight to the Magistrate Judge's credibility findings, the Court adopts the finding of the Magistrate Judge that the prosecutor's strike of McGee violated the Equal Protection Clause, as described in *Batson*. *See Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008) (" '[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose' ") (quoting *United States v. Vasquez–Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

Respondent objects that the Magistrate Judge "disregarded Mr. Baker's testimony regarding the general practices he employed to select Petitioner's jury." (Doc. # 57 at 3). The Ninth Circuit has indicated that "a firm set of specific guidelines that [a prosecutor] consistently employed" during jury selection may constitute "competent evidence of a prosecutor's actual reasons for striking certain jurors." *Paulino v. Harrison*, 542 F.3d 692, 701 n. 10 (9th Cir.2008) (declining to reach the issue because the prosecutor "did not testify to a firm set of specific guidelines that she consistently employed"). In the Report and Recommendation, the Magistrate Judge expressly considered Baker's testimony concerning his "general practices." (Doc. # 55 at 25, 43–44). However, the Magistrate Judge noted that Baker testified that his handling of Love's case was not consistent with how he would normally conduct a case. (*Id.* at 43.) The Magistrate Judge reasonably concluded that Baker's "uneven application of his general principles," as illustrated by comparative juror analysis, constitutes evidence of pretext. (*Id.* at 44). Even Baker testified that his "general approach to jury selection involves rules of thumb," and "the rules of thumb are sometimes applied and sometimes not." (Doc. # 44–1 at 72). Baker's "general practices" were not "a firm set of specific guidelines that [he] consistently employed," and the Magistrate Judge reasonably discounted them. *Paulino*, 542 F.3d at 701 n. 10. This objection is overruled.

Respondent objects that "the Magistrate Judge imposed a burden on the state where none exists," because, at stage three of the *Batson* inquiry, "the state did not have a burden to produce the reasons for retaining Jurors No. 4, 8, 10, and prospective alternate juror Ms. [Garibay]." (Doc. # 57 at 7–8). In the Report and Recommendation, the Magistrate Judge correctly set forth the legal framework surrounding *Batson* challenges, including the burden of proof. (Doc. # 55 at 22–24; *see also id.* at 23–24 ("At step three of the *Batson* inquiry, the question is 'whether the opponent of the strike has proved purposeful racial discrimination.' The ultimate burden of persuasion regarding racial motivation 'rests with, and never shifts from, the opponent of the strike.' Thus, Petitioner Love has the burden of proving purposeful discrimination.") (quoting *Johnson v. California*, 545 U.S. 162, 168, 171, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005))). The Magistrate Judge confined his analysis to step three of the *Batson* inquiry. The Magistrate Judge did not impose a burden on Respondent to produce reasons for retaining the jurors who were the subject of comparative analysis with McGee. Instead, the Magistrate Judge properly applied the principle that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller–El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). This objection is overruled.

Finally, Respondent objects that "the Magistrate Judge failed to conduct a true comparative analysis," because "Ms. McGee was not comparable to Jurors No. 4, 8, 10 or prospective alternate juror Ms. [Garibay]." (Doc. # 57 at 2, 9). "Two jurors do not have to have all the same characteristics to be similarly situated. 'A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.'" *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008) (quoting *Miller–El*, 545 U.S. at 247 n. 6, 125 S.Ct. 2317). In the Report and Recommendation, the Magistrate Judge conducted a thorough and proper compara-

tive analysis. The Magistrate Judge recognized that "[f]or a comparative analysis to be useful, the compared jurors must be similarly situated." (Doc. # 55 at 34 (citing *Mitleider v. Hall*, 391 F.3d 1039, 1049 n. 9, 1050 (9th Cir.2004)). However, the Magistrate Judge properly refused to engage in "speculation about the prosecutor's knowledge or motive." (Doc. # 55 at 35 (citing *Paulino*, 542 F.3d at 700)). "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller–El*, 545 U.S. at 252, 125 S.Ct. 2317. Respondent's theory regarding why prospective alternate juror Garibay was not similarly situated to McGee, *see* Doc. # 57 at 9, constitutes post-hoc speculation by Respondent's counsel, and is contradicted by Baker's testimony. (Doc. # 44–1 at 77 ("[W]hen you're looking at an alternate ... I don't think there's any difference in philosophy and approach."); 78 ("I would have guessed I would have struck her.")). Respondent's arguments about Jurors No. 4, 8 and 10 involve application of Baker's inconsistently-applied "the rules of thumb," discussed above. (Doc. # 44–1 at 72). McGee shared some of Baker's positively-viewed "rules of thumb" (e.g., she was married, and had children, a blue-collar spouse, a sister who worked in a sheriff's office, and a brother-in-law who was a correctional officer). To the extent Baker based his decision-making as to Jurors No. 4, 8, 10 and alternate Garibay on his "rules of thumb" and he was unaware of whether McGee did or did not share those relevant characteristics (such as town of residence, age, occupation of spouse, existence of children, etc.), Baker's failure to question McGee to determine whether she likewise shared these positively-viewed "rules of thumb" is itself evi-

dence of pretext. *See Miller–El*, 545 U.S. at 246, 125 S.Ct. 2317 ("The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."); *United States v. Esparza–Gonzalez*, 422 F.3d 897, 905 (9th Cir.2005) ("[T]he prosecutor had very little hard information to base this decision on. Although the prosecutor has no obligation to question all potential jurors, his failure to do so [before] removing a juror of a cognizable group ... may contribute to a suspicion that this juror was removed on the basis of race."). This objection is overruled.

Petitioner objects to the Magistrate Judge's conclusion that an expansive definition of "teacher" was not required by the law of the case doctrine. (Doc. # 58 at 2). In the Report and Recommendation, the Magistrate Judge stated:

> When making its juror comparisons, neither the law of the case doctrine nor the rule of mandate requires the Court to consider instructional assistants and teacher's aides to be teachers. The prosecutor's stated race-neutral explanation is the touchstone. Even so, a comparison between McGee and each juror with a teaching-related career is instructive. Prosecutor Baker acknowledged that the distinction between teachers, instructional assistants, and teacher's aides was not one of kind, but of degree.

(Doc. # 55 at 33 (citing Doc. # 44–1 at 56–58)). The Magistrate Judge proceeded to conduct a comparative juror analysis between McGee and each juror with a teaching-related career. Petitioner fails to indicate how a comparative juror analysis would have proceeded any differently had the Magistrate Judge concluded that an expansive definition of "teacher" was required by the law of the case. According-

ly, this objection is overruled for failure to show prejudice.

Petitioner objects to the Magistrate Judge's granting of Respondent's motion to strike the transcript of the December 2008 interview of Baker. Petitioner contends that the December 2008 interview transcript, which was attached to Petitioner's Post–Hearing Legal Brief (Doc. # 48), is "probative in triangulating the historical facts and in assessing the credibility of Mr. Baker's testimony." (Doc. # 58 at 7–8). However, a review of Petitioner's Post–Hearing Legal Brief shows that, with a single exception, his citations to the December 2008 interview transcript are merely cumulative of his citations to Baker's testimony before the Magistrate Judge. (Doc. # 48 at 7–12, 14, 17). The sole exception is in a footnote, where Petitioner states:

> [T]he fact there is no evidence of an official policy of discrimination is no more dispositive than in numerous cases where *Batson* claims were sustained without such a showing. It is noteworthy, though, that Baker had previously described *Batson/Wheeler* challenges as 'com[ing] up often in our county,' if only due to the local demographics, [citing to the December 2008 interview], but at the evidentiary hearing he retreated from this, saying only that they 'come up often during trial where the defense feels they may be violated.'

(Doc. # 48 at 18 n. 15 (citations omitted)). In the Report and Recommendation, the Magistrate Judge did not discuss the issue of whether there existed "evidence of an official policy of discrimination." *Id.* Accordingly, this objection is overruled for failure to show prejudice.

Petitioner makes two additional objections regarding the weight the Magistrate Judge assigned to two of Petitioner's arguments. (Doc. # 58 at 8–12). After review of these objections and the relevant portions of the Report and Recommendation, the Court overrules each objection for the reasons stated in the Report and Recommendation. (Doc. # 55 at 39–41, 47).

Finally, Petitioner requests that the Court make two "corrections and clarifications" to the Report and Recommendation. (Doc. # 58 at 12). First, Petitioner asserts:

> The R & R states:
>
>> before entering the courtroom, Baker asked whether it was a 'life case,' to which the judge responded that there was a possible '20 indeterminate life sentence.'
>
> Actually, the trial transcript shows that the judge merely replied, '20,' and it was Baker who added the comment on the indeterminate life sentence.
>
> The R & R should be amended to clarify the proper attributions and that the numeral '20' in the exchange seemingly refers to the number of peremptory challenges allotted to each side in a case with a possible life sentence.

*Id.* (citing Cal.Code of Civ. Proc. § 231(a)). The Court will amend the Report and Recommendation to clarify the proper attributions from the transcript. There is no suggestion in the record or in the Report and Recommendation that Baker believed he had no remaining peremptory strikes or that he adjusted his juror selection strategy due to an erroneous belief about the number of his available strikes. Accordingly, this portion of the Report and Recommendation will not be amended further.

Pursuant to Petitioner's second requested correction, the Report and Recommendation will be amended to correct the spelling of the name of venire-member Lovecchio.

**CONCLUSION**

IT IS HEREBY ORDERED that the Magistrate Judge's Report and Recommendation (Doc. # 55) is **ADOPTED** in its entirety, except for the following two amendments:

(1) Page 6, line 26 is stricken in its entirety and replaced with, " '20'. Baker responded, '20 indeterminate life sentence.' "

(2) On page 7, line 4, "Lovecchino" is stricken and replaced with "Lovecchio".

IT IS FURTHER ORDERED that the Petition for Writ of Habeas Corpus (Doc. # 1) will be **GRANTED,** unless the State of California grants Petitioner a new trial no later than 180 days from the date of this Order. The parties shall file a joint status report no later than 180 days from the date of this Order.

**REPORT AND RECOMMENDATION GRANTING PETITION FOR WRIT OF HABEAS CORPUS [DOC. NO. 1] AND ORDER GRANTING RESPONDENT'S MOTION TO STRIKE EXHIBIT B**

RUBEN B. BROOKS, United States Magistrate Judge.

### *INTRODUCTION*

Alfredrick Love, an African–American, was tried and convicted of battery on a non-confined person by a prisoner. During the second day of jury selection, Monday, July 21, 2003, Assistant District Attorney Eric Baker excused the lone African–American from the jury. His motivation for that peremptory challenge is the subject of this proceeding.

**1.** The trial court transcript refers to some jurors by name and others by number, presumably to protect the privacy of those mak-

## I. BACKGROUND

### A. *The Jury Selection*

On December 4, 2002, the Imperial County District Attorney filed an information charging Alfredrick Love with two counts of battery on a non-confined person by a prisoner in violation of California Penal Code section 4501.5 for his attacks against Sergeant Kenneth Grady and Correctional Officer B. Walker. (Lodgment No. 1, Clerk's Tr. vol. 1, 001C–002, Dec. 4, 2002.) The information also alleged the following sentencing enhancements: (1) Petitioner committed the charged batteries while confined in state prison within the meaning of California Penal Code section 1170.1(c), and (2) Love had three prior serious or violent felony convictions for robbery that would result in sentencing enhancements under California Penal Code sections 667(b)-(i) and 1170.12(a)-(d). (*Id.*); *see also* Cal.Penal Code § 211 (West 2008).

### 1. Jury Selection—Day One

Jury selection began on July 17, 2003. Love represented himself during the jury selection process and at trial. (J. Mot. File Tr. State Proceedings, Attach. # 1 Tr. 134, 216, July 17, 2003.) On the first day of the selection process, Assistant District Attorney Christopher Kowalski represented the People of California. (*Id.*) The Honorable Jeffrey B. Jones excused or deferred service for all the potential jurors with qualifying hardships. (*Id.* at 170–73.) He then questioned the twenty-four remaining potential jurors. (*Id.* at 173–201.) Among them were Sahid Ramirez, later struck by Prosecutor Baker, and juror four, one of the jurors who is the subject of this Court's comparative analysis.[1] (*Id.* at 172.)

ing that request. This Court will use the same identifying information here.

Ramirez told the trial court he was from Calexico; he was married with a young baby; he worked at the "[S]ocial [S]ecurity office;" his wife was a tutor at an elementary school; and he had no prior jury experience. (*Id.* at 176.) Juror four stated her residence and explained that she was married with three children and one grandchild; she was "an instructional assistant;" her husband was a maintenance worker; and she had no prior jury experience. (*Id.*) Other prospective jurors disclosed similar background information and responded to questions from the court. (*Id.* at 176–201.)

Next, Assistant District Attorney Kowalski and Love questioned the potential jurors. (*Id.* at 201–252.) Neither directed any questions to Ramirez or juror four. (*Id.*) Following questioning, the prosecutor and Love each challenged certain prospective jurors for cause, and the trial judge excused five individuals from the jury panel. (*Id.* at 252–60.) After vacancies in the jury box were filled, Kowalski and Love were permitted to make peremptory challenges to the first twelve potential jurors. (*Id.* at 260–63.) Kowalski exercised four peremptory challenges, and Love exercised three; the court excused each challenged juror. (*Id.*)

Judge Jones drew nine additional names. (*Id.* at 263–65.) He then conducted the court's voir dire of the new potential jurors. (*Id.* at 266–77.) Gloria McGee, the focal point of Love's *Batson* challenge, was among this group. (*Id.* at 264.) She was married, had three children, was an eligibility worker, and had no prior jury experience. (*Id.* at 266.) Her husband was a retired electrician. (*Id.* at 268.) In addition, she disclosed that her brother-in-law was a correctional officer at Calipatria State Prison, and her sister was a supervisor in the records section of the sheriff's department. (*Id.* at 275.)

Kowalski and Love questioned the nine new potential jurors. (*Id.* at 277–94.) The prosecutor asked McGee questions about her contacts and conversations with her sister and brother-in-law. (*Id.* at 291–93.)

Following the questioning, the judge excused two individuals from the group of nine for cause. (*Id.* at 296.) Next, Kowalski and Love each exercised three peremptory challenges, and the court excused the challenged jurors. (*Id.* at 296–98.) Their vacancies were filled from the group of nine potential jurors outside the jury box. (*Id.*) McGee moved to seat number one. (*Id.* at 298.) This concluded the first day of voir dire. (*Id.* at 297–98.)

### 2. Jury Selection—Day Two

When the trial resumed the following Monday, July 21, 2003, Kowalski was unavailable due to illness, and attorney Gordon Goodman appeared for the People of California. (*Id.* Attach. # 2 Tr. 304, 307, July 21, 2003.) An additional group of potential jurors was brought to the courtroom. (*Id.* at 310.) Judge Jones excused or deferred service for those individuals with qualifying hardships. (*Id.* at 337–41.)

After a recess, Assistant District Attorney Eric Baker, the prosecutor whose actions are the subject of Love's *Batson* challenge, entered the courtroom. (*Id.* at 347.) He stated that he had been assigned to the case and was prepared to proceed. (*Id.*) At that point, Goodman was excused. (*Id.* at 348.) The judge explained that there were twelve potential jurors in the jury box who had been questioned during the first day of voir dire. (*Id.* at 347–48.) The court called another twelve individuals to fill the seats outside the jury box. (*Id.* at 348.)

Judge Jones then conducted the court's voir dire of the twelve additional potential jurors. (*Id.* at 349–63.) Among this group of twelve were jurors eight and ten,

Denise Garibay, Karl Noris, and alternate number one. (*Id.* at 348–49.)

Juror eight stated her city of residence and explained that she was married with three children and one grandchild. (*Id.* at 352.) She was employed as a "teacher's aide;" her husband was retired from his job as a cowboy in a feed lot; and she had served on a jury approximately ten to twelve years earlier but could not remember if it was in a civil or criminal case. (*Id.*) Juror ten was a Holtville resident; she was not married, had one child, and was a "school teacher." (*Id.* at 351.) Her ex-husband was a farmer, and she served on a criminal case about fifteen years earlier. (*Id.*)

Garibay lived in El Centro, was divorced, had two children, was a teacher for "Imperial County Office of Education[,]" and her ex-husband worked for a tire repair service. (*Id.* at 353.) Noris lived in El Centro, had no children, was single, went to Imperial College, and had no prior jury experience. (*Id.*) Alternate number one stated her residence and explained that she was married with a daughter, "work[ed] at Jefferson El Centro School[,]" and her husband worked for the family tire service. (*Id.* at 353–54.)

After the court's questioning was completed, the trial judge told Baker he had twenty minutes to question the jurors. (*Id.* at 363–64.) Baker had the notes that Kowalski had taken about the jurors. (Tr. Evidentiary Hr'g 17, Mar. 12, 2009.) They contained the jurors' occupations, but "not all the jurors had the same amount of notes written on them." (*Id.*) The only information Baker recalled about McGee from the notes was that she was an eligibility worker, which he would characterize as a social worker. (*Id.* at 22–23, 25.)

Prosecutor Baker asked the potential jurors generally about any personal contacts with law enforcement; could they hold a pro se defendant to the same standard as the prosecution, and could they base their decision on the evidence in this case. (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 364–66.) He asked one juror if he would be able to vote guilty if the prosecution proved its case beyond a reasonable doubt. (*Id.* at 366.) Baker asked if anyone felt uncomfortable because the case involved an incident that occurred in state prison and whether there were any other reasons they did not want to sit on the jury that they had not already shared. (*Id.*) Love did not ask any questions. (*Id.*)

Next, Baker and Love conferred with the judge in chambers, and Love made one challenge for cause that the judge granted. (*Id.* at 366–67.) Judge Jones then explained they would resume peremptory challenges once they returned to the courtroom. (*Id.*) Baker asked whether the individuals in the jury box had been challenged yet. (*Id.*) The judge responded that each party could make peremptory challenges of the jurors seated in the jury box. (*Id.* at 367–68.) The prosecution had already exercised seven peremptory challenges, and Love had exercised six; Baker would be the first to exercise a challenge. (*Id.* at 368.) Before reentering the courtroom, Baker asked whether it was a "life case," to which the judge responded that there was a possible "20 indeterminate life sentence." (*Id.*)

After the trial judge excused one individual for cause, Baker began his peremptory challenges. (*Id.*) His first challenge was to McGee, the only African–American potential juror. (*Id.* at 369, 371.) Love exercised a peremptory challenge, and then Baker excused Ramirez, the individual who worked at the Social Security office. (*Id.* at 369.) Next, Love excused Lovecchino, a high school special education teacher. (*Id.* at 351, 369.) The prosecutor exercised another peremptory strike, fol-

lowed by Love, and then Baker exercised a fourth strike. (*Id.* at 370.) Both Baker and Love indicated they had no other peremptory challenges. (*Id.*)

Before the jurors were sworn, Love asked for a side-bar conference to address the court. (*Id.* at 371.) He made a "*Wheeler/Batson*" objection to Baker's dismissal of McGee, the only African-American on the jury panel.[2] (*Id.*) The court sought a response from the prosecutor, and Baker offered the following explanation:

> ... I would offer as my reason is that she's a social worker and eligibility worker. I excused both of those that I believed to be that. That is a personal—my personal jury selection. Teachers and social workers don't sit on the jury. I referred to Chris Kowalski's notes who was in original voir dire. It appears she was an eligibility worker. They are not favorable jurors to the prosecution.

(*Id.* at 371–72.)

Love countered:

> From my notes, she's not a teacher and social worker. The only thing about her background has been law enforcement, which makes it seem—conventionally she would be leaning towards the District Attorney. The only thing I can see that you would possibly dismiss her for is that she's African/American.

(*Id.* at 372.)

The court overruled Love's objection.

> I'll deny the motion on the following basis. First of all, to my knowledge—and I believe this is correct of the entire groups we've brought in, which would

have been a total of about—I'm going to say 155, 160 people—Ms. McGee was the only African/American.

> . . . .

> I think she's the only one that remained after hardships. I don't think there was anybody left.

> . . . .

> And so the People's exercise of peremptory challenge as to the only African/American juror in the entire available panel I don't think shows a pattern which is required. It's one peremptory out of many. And I do find that the reason offered by Mr. Baker for the exercise of the challenge is a—although not a challenge-for-cause reason, it establishes there was not a discriminatory motive based upon her membership of the protective class.

> I'll deny the motion, Mr. Love. But I think you've made your record.

(*Id.* at 372–73.) Love asked, "Did he indicate that he had removed all teachers and social workers?" (*Id.* at 373.) Judge Jones responded, "He indicated that was the reason for removing Ms. McGee." (*Id.*)

The jury was sworn in, and the judge decided there should be one alternate. (*Id.* at 374.) Each party had one peremptory challenge to the alternate. (*Id.*) The next three jurors were Garibay, a teacher; Noris, an unmarried student; and alternate number one, who stated she worked at a local school. (*Id.* at 374–75.) Baker passed, and Love exercised his peremptory challenge on Garibay. (*Id.* at 375–76.) The prosecutor then exercised his peremp-

---

**2.** In *People v. Wheeler,* 22 Cal.3d 258, 276–77, 583 P.2d 748, 761–62, 148 Cal.Rptr. 890, 903 (1978), the California Supreme Court held that the prosecution's use of peremptory challenges to eliminate jurors on the basis of "group bias," including challenges on the basis of membership in a certain racial group, violates the California Constitution. Similarly, the United States Supreme Court, in *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that the prosecution's use of peremptory challenges to eliminate African–Americans from the jury pool violates the Equal Protection Clause.

tory challenge on Noris. (*Id.* at 375.) Thus, the remaining person became the alternate. (*Id.*) Jury selection was completed, and the remaining potential jurors were excused. (*Id.* at 375–76.)

### B. *The Subsequent Procedural History*

On July 28, 2003, the jury convicted Petitioner of battery on Sergeant Grady but acquitted him of battery on Officer Walker. (Lodgment No. 1, Clerk's Tr. vol. 2, 361–62, July 28, 2003.) The jurors found the allegations of three prior felony convictions were true. (*Id.* at 365.)

Petitioner filed a motion for new trial on August 11, 2003. (*Id.* at 377, Aug. 11, 2003.) One of the bases of Love's motion was the trial court's denial of his *Wheeler/Batson* motion to set aside the prosecutor's peremptory challenge of McGee. (*Id.* at 389–90); *see Batson v. Kentucky,* 476 U.S. at 89, 106 S.Ct. 1712; *People v. Wheeler,* 22 Cal.3d at 276–77, 583 P.2d at 761–62, 148 Cal.Rptr. at 903. In addition, Petitioner moved to strike his prior convictions. (Lodgment No. 1, Clerk's Tr. vol. 2, 370.)

The trial judge denied Love's motions. (*Id.* at 415.) The court sentenced Petitioner, a confined inmate, to twenty-five years to life in prison, which was to run consecutively to the term he was already serving. (*Id.*) Love was also ordered to pay a restitution fine of $200 pursuant to California Penal Code section 1202.4(b). (*Id.*)

Petitioner filed an appeal, arguing that the denial of his *Wheeler* motion was in error and required reversal. (Lodgment No. 2, Appellant's Opening Brief at 8, *People v. Love,* No. D043053, 2005 WL 240903 (Cal.Ct.App. Feb. 2, 2005).) The California Court of Appeal affirmed Love's conviction on February 2, 2005. (Lodgment No. 5, *People v. Love,* No. D043053, slip op. at 1, 9, 2005 WL 240903 (Cal.Ct.App. Feb. 2, 2005).)

Petitioner filed a petition for review in the California Supreme Court, raising the same *Wheeler/Batson* argument regarding the prosecutor's alleged impermissible use of a peremptory challenge. (Lodgment No. 6, Petition for Review at 3, *People v. Love,* No. S132156 (Cal. Apr. 13, 2005).) The court summarily denied Love's petition on April 13, 2005. (Lodgment No. 7, *People v. Love,* No. S132156, order at 1 (Cal. Apr. 13, 2005).)

On March 22, 2006, Love, proceeding pro se and in forma pauperis, filed a federal Petition for Writ of Habeas Corpus [doc. no. 1]. Petitioner alleged one claim for relief: Assistant District Attorney Baker's use of a peremptory challenge to exclude "all black jurors from the seated panel" and the trial court's denial of Love's motion to set aside the peremptory challenge of the only African–American juror, McGee, resulted in a violation of Petitioner's right to equal protection under the Fourteenth Amendment. (Pet. 5.)

This Court issued a Report and Recommendation Re: Denying Petition for Writ of Habeas Corpus and Order Denying Request for Evidentiary Hearing on September 7, 2006 [doc. no. 11]. Love timely filed an objection [doc. no. 12]. United States District Judge William Q. Hayes adopted the Report and Recommendation and entered judgment in favor of Respondent on January 19, 2007 [doc. no. 15]. Judge Hayes granted Petitioner's request for a certificate of appealability on February 14, 2007 [doc. no. 18].

The Ninth Circuit, on March 19, 2008, reversed the judgment and remanded the case for an evidentiary hearing to determine whether the prosecution struck McGee on the basis of her race [doc. no. 25]. The circuit court held that the California Court of Appeal unreasonably applied clearly established federal law, so "the inquiry into whether the prosecutor's

reason for rejecting the black juror was pretextual must be determined *de novo* on federal habeas." *Love v. Scribner*, 278 Fed.Appx. 714, 718 (9th Cir.2008) (quoting 28 U.S.C. § 2254(d)(1)) (citing *Frantz v. Hazey*, 533 F.3d 724, 739 (9th Cir.2008) (en banc)).

This Court appointed counsel for Petitioner [doc. no. 29]. Prehearing conferences with counsel for Love and Respondent were held on October 21 and November 18, 2008 [doc. nos. 33, 34]; the evidentiary hearing was set for December 2, 2008, but continued to March 12, 2009 [doc. nos. 33, 34, 37, 38]. The evidentiary hearing was held on that date [doc. no. 43]. Two witnesses testified at the hearing: Eric Baker, a former deputy district attorney in the Imperial County District Attorney's Office, and Love, the African–American Petitioner. (Tr. Evidentiary Hr'g 1–3, 82.)

The parties jointly filed a copy of the transcript of the superior court jury selection proceedings [doc. no. 45]. On April 28, 2009, Respondent submitted his Post–Evidentiary Hearing Opening Brief [doc. no. 46]. Petitioner filed a Post–Hearing Legal Brief [doc. no. 48]. Attached as Exhibit B to the brief is a copy of the transcript of a prehearing interview of Eric Baker. (Pet'r's Post–Hr'g Br. Ex. B.) Respondent's Post–Evidentiary Hearing Reply Brief was submitted on May 29, 2009 [doc. no. 49]. The brief also contains a request to strike Exhibit B to Petitioner's Post–Evidentiary Hearing Brief. (Resp't's Post–Evidentiary Hr'g Br. 1.) Love filed an Opposition to Motion to Strike and Surreply to Post–Hearing Briefing [doc. no. 50].

On July 7, 2009, the Ninth Circuit decided *Ali v. Hickman*, 571 F.3d 902 (9th Cir.), *amended by* 584 F.3d 1174 (9th Cir.2009), a case discussing a *Batson* challenge to a state court conviction [doc. no. 52]. Petitioner and Respondent each filed supplemental briefs addressing *Ali* [doc. nos. 53, 54].

## II. THE SCOPE OF THIS PROCEEDING

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C.A. § 2244 (West Supp.2008), applies to all federal habeas petitions filed after April 24, 1996. *Woodford v. Garceau*, 538 U.S. 202, 204, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). AEDPA sets forth the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006); *see also Reed v. Farley*, 512 U.S. 339, 347, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994); *Hernandez v. Ylst*, 930 F.2d 714, 719 (9th Cir.1991). Because Love's Petition was filed on March 22, 2006, AEDPA applies to this case. *See Woodford*, 538 U.S. at 204, 123 S.Ct. 1398.

Amended § 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d).

On remand from the Ninth Circuit, this Court must now determine the merits of Love's *Batson* claim. The federal appellate court held that the California Court of Appeal's refusal to conduct a comparative juror analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law." *Love,* 278 Fed. Appx. at 717 (quoting 28 U.S.C. § 2254(d)(1)) (citing *Kesser v. Cambra,* 465 F.3d 351, 360 (9th Cir.2006) (en banc)). Love's case was remanded "for an evidentiary hearing to determine whether the prosecution struck Ms. M. from the jury because of her race." *Id.* at 718. This Court will make that de novo finding under *Batson,* 476 U.S. 79, 106 S.Ct. 1712, and its progeny.

■ There is a well-established, three-part test for evaluating a *Batson* challenge to the prosecutor's use of peremptory challenges. *Ali v. Hickman,* 584 F.3d at 1180–81.

First, the defendant must make a prima facie showing that a challenge was based on race. *See Kesser,* 465 F.3d at 359. If such a showing is made, the burden then shifts to the prosecutor to produce a "clear and reasonably specific" race-neutral explanation for challenging the potential juror. *See id.* Third and finally, the court must determine whether, despite the prosecutor's proffered justification, the defendant has nonetheless met his burden of showing "purposeful discrimination." *See id.*

*Ali, id.; accord Love v. Scribner,* 278 Fed. Appx. at 716.

■ A prima facie case of purposeful discrimination is established if "(1) the prospective juror is a member of a 'cogni-zable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was [motivated] by race." *Boyd v. Newland,* 455 F.3d 897, 901 (9th Cir.2006) (citations omitted).

Baker told the trial judge that he exercised a peremptory challenge to McGee based on her occupation as a "social worker and eligibility worker" and that his personal preference was that "[t]eachers and social workers don't sit on the jury." (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 371.) The Ninth Circuit found the explanation "sufficient to satisfy the prosecutor's burden at the second *Batson* step." *Love v. Scribner,* 278 Fed.Appx. at 716.

■ *Batson's* first two steps are "mere burdens of production," but step three is where the challenge is decided. *Yee v. Duncan,* 463 F.3d 893, 898 (9th Cir.2006). "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

### A. *The Mandate Rule*

The remand to the district court was limited. The Ninth Circuit explained, "[T]he [state] trial court did not allow Love to examine the prosecutor's actual reasons for keeping the teaching-connected individuals, while striking Ms. M. from the jury." *Love v. Scribner,* 278 Fed.Appx. at 718. The district court was to hold an evidentiary hearing to decide if Baker struck McGee from the jury because she was African–American. *Id.*

Petitioner and Respondent disagree on whether Baker may amplify his earlier

explanation for challenging McGee. In its opinion, the Ninth Circuit addressed Baker's comments but did not decide their preclusive effect.

In this case, the prosecutor explained that he excused the only available African–American member of the jury pool because she was a "social worker and eligibility worker" and his policy was that "teachers and social workers don't sit on the jury." Because the disputed juror was an eligibility worker, whom the prosecution also described as a social worker, this explanation is sufficient to satisfy the prosecutor's burden at the second *Batson* step.

*Love v. Scribner,* 278 Fed.Appx. at 716. Love contends that Respondent is attempting to recast prosecutor Baker's absolutism into a flexible rule and is precluded from doing so.

"On remand, the doctrine of the law of the case is rigid; the district court owes obedience to the mandate of … the court of appeals and must carry the mandate into effect according to its terms." 18 James Wm. Moore, et al., *Moore's Federal Practice* § 134.23[1][a], at 134–59 (3d ed.2009) (footnote omitted). "The nondiscretionary aspect of the law of the case doctrine is sometimes called the 'mandate rule.'" *Id.* at 134–58 to 59 (footnote omitted).

■■■ "[I]n the Ninth Circuit, the mandate rule is jurisdictional, implicating the 'power,' not just the preferred or common practice, of the district courts." *Taltech Ltd. v. Esquel Enters.,* 609 F.Supp.2d 1195, 1200 (W.D.Wash.2009) (citing *United States v. Thrasher,* 483 F.3d 977, 982 (9th Cir.2007)). The rule precludes this Court from reconsidering any issue decided explicitly or by necessary implication by the Ninth Circuit. *Id.* "On remand, the trial court should only have considered matters left open by the mandate of [the appellate] court." *Waggoner v. Dallaire,* 767 F.2d 589, 593 (9th Cir.1985) (internal quotations omitted) (citing *Moore v. James H. Matthews & Co.,* 682 F.2d 830, 834 (9th Cir. 1982)). Some circuits describe the rule as a "specific application of the law of the case doctrine." *Jones v. Lewis,* 957 F.2d 260, 262 (6th Cir.1992) (citations omitted).

■■■ The mandate rule and the law of the case doctrine are frequently cited without differentiating one from the other. "There certainly is a difference between the two doctrines, and they are not identical. While both doctrines serve an interest in consistency, finality and efficiency, the mandate rule also serves an interest in preserving the hierarchical structure of the court system." *United States v. Thrasher,* 483 F.3d at 982. "[T]he [mandate] doctrine is 'similar to, but broader than, the law of the case doctrine.'" *Id.*

The Ninth Circuit remand limits this Court's jurisdiction. *Id.* (citation omitted); *see also United States v. Hall,* 434 F.Supp.2d 19, 24 n. 3 (D.Me.2006) ("[N]ew evidence cannot be considered if it bears on an issue that was not left open by an appellate decision remanding for further proceedings on other issues.") (quoting 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 4478, at 685 (2d ed.2002)).

"At *Batson's* second step, the question of whether the state has offered a 'race-neutral' reason is a question of law…." *Paulino v. Harrison (Paulino II),* 542 F.3d 692, 699 (9th Cir.2008) (citation omitted). In Petitioner's case, the question has been answered. The appellate court found that step two in evaluating the *Batson* challenge was satisfied. *Love v. Scribner,* 278 Fed.Appx. at 716. Step two pertains to the burden of producing evidence; the merits of the challenge are not resolved at that stage. Thus, step two of the test is not the focus of this proceeding.

Baker's testimony that a disfavored occupation such as a social worker or teacher was merely a factor to consider when deciding whether to strike a possible juror cannot add to the analysis at step two. Nevertheless, the testimony is relevant to this Court's "ultimate [step three] determination of whether there has been purposeful discrimination." *Yee,* 463 F.3d at 901; *see also Gonzalez v. Brown,* 07–56107, 585 F.3d 1202, 1208 (9th Cir.2009) ("While the issue of whether these facts establish the inference to support the first step of *Batson* is not before us, they are relevant to whether it was objectively unreasonable to conclude Gonzalez had not met his ultimate burden at *Batson* step three.)

### B. *The Motion to Strike Petitioner's Exhibit B*

■ Before considering the merits of Love's *Batson* claim, the Court must address Respondent's motion to strike Exhibit B to Petitioner's Post–Hearing Legal Brief. (Post–Evidentiary Hr'g Reply Br. 1.) Exhibit B is the transcript of an interview of former Assistant District Attorney Eric Baker.

In December of 2008, Baker was interviewed by counsel for the Respondent. (Tr. Evidentiary Hr'g 33–36.) The session was "tape recorded." (*Id.* at 35.) A transcript of that interview was prepared and provided to Petitioner's counsel. At the evidentiary hearing, neither counsel for Petitioner nor counsel for Respondent sought to introduce the interview transcript into evidence, although both referred to the prior interview. Two months later, on May 15, 2009, Love attached a copy of the Baker transcript as Exhibit B to Petitioner's Post–Hearing Legal Brief.

The Respondent notes that Love's attorney was provided an opportunity to submit additional evidence at the conclusion of the evidentiary hearing, but he declined. (Post–Evidentiary Hr'g Reply Br. 1.) Peti-tioner's counsel stated that he had no further evidence and only asked that one exhibit, a letter from the Imperial County District Attorney's Office, be admitted into evidence. (Tr. Evidentiary Hr'g 85–86.) Respondent complains that the "attempt to submit new evidence at this late [juncture] is improper." (Post–Evidentiary Hr'g Reply Br. 1.) He also objects to the interview transcript as hearsay and lacking foundation. (*Id.*)

Petitioner describes Exhibit B as a copy of an "interview [of Baker] conducted in the Attorney General's office at which two deputies (including current counsel) were present, along with an investigator, and Mr. Baker's daughter. The interview was conducted ex *parte,* and there was no questioning by opposing counsel." (Opp'n Mot. Strike & Surreply 2.) Love contends that the prosecutor confirmed the substance of the interview at the evidentiary hearing; and for that reason, there should be no doubt as to its authenticity. (*Id.*) The interview took place over six months before Love submitted it to the Court and was referred to extensively during the evidentiary hearing, so there was no unfair surprise. (*Id.*) Additionally, Love argues that "the interview citations show merely to what extent Mr. Baker's memory was confirmed or not by his prior rendition." (*Id.*) He maintains that this use of the transcript is not hearsay. (*Id.*)

In his Post–Hearing Brief, Love cites the federal evidentiary hearing and Baker interview transcripts in tandem. (Pet'r's Post–Hr'g Br. 7–12, 14, 17.) Although he argues to the contrary, Petitioner is seeking to use the transcribed interview as substantive evidence. Labeling his use a "non-hearsay purpose" does not make it so.

■ In neither his Post–Hearing Brief nor his Opposition to Motion to Strike did Love ask to reopen the record

to lay the foundation and introduce the Baker interview into evidence. A motion to reopen the record to submit additional evidence is addressed to the sound discretion of the Court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (citations omitted). "[T]he particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific...." *Rivera–Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 746 (1st Cir. 1995). The Court should consider whether: "(1) [T]he evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is *bona fide;* and (3) reopening will cause no undue prejudice to the nonmoving party." *Id.* (citations omitted).

The Baker interview is cumulative. Love fails to highlight any statement in the transcript that is particularly probative. Courts generally act within their discretion in refusing to reopen a case for cumulative evidence or evidence with little probative value. *Id.* (citing *Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1285 (10th Cir.1994); *Thomas v. SS Santa Mercedes*, 572 F.2d 1331, 1336 (9th Cir.1978)). In *Thomas*, the Ninth Circuit found that the trial court acted within its discretion in denying a motion to reopen to hear new evidence that "does not have the persuasive power [appellant] claims for it." *Thomas*, 572 F.2d at 1336.

The state trial court proceedings and Baker's testimony at the federal evidentiary hearing are before the Court. In this context, the transcript of Baker's tape recorded interview is not "especially important and probative."

Petitioner offers no reason why the transcript could not have been introduced into evidence before his Post–Hearing Brief, filed two months after the evidentiary hearing concluded [doc. nos. 43, 48].

Inadvertence is not a compelling explanation. Yet, Respondent does not claim that he will be prejudiced by consideration of the transcript. (Resp't's Post–Evidentiary Hr'g Reply Br. 1.) Instead, he argues that it is hearsay and lacks foundation. (*Id.*)

It is unclear whether the interview was under oath; the transcript was not certified by a reporter; Baker did not review it for mistakes; and he did not sign the transcript. (*See* Pet'r's Post–Hr'g Br. Ex. B at 5–6, 63; Tr. Evidentiary Hr'g 34–36.) The objections are well taken. This proceeding will not be reopened to provide Love an opportunity to introduce the Baker interview transcript into evidence.

■■■■ Alternatively, Love moves to include Exhibit B as a document relating to the Petition pursuant to Rule 7(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. (*Id.* at 3.) The rule provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition." Rule 7(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. "The purpose [of the rule] is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." *Id.* advisory committee's note on 1976 adoption. "An expanded record may also be helpful when an evidentiary hearing is ordered." *Id.*

> But with respect to methods for securing facts where necessary to accomplish the objective of [habeas] proceedings Congress has been largely silent. Clearly, in these circumstances, the habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage.

*Harris v. Nelson*, 394 U.S. 286, 299, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). *But cf.*

*Williams v. Schriro,* 423 F.Supp.2d 994, 1003 (D.Ariz.2006) (refusing to allow petitioner to supplement the record with declarations that were not relevant to his claims).

Rule 7(b) identifies items that may be included in an expanded record. "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record." Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. The Baker interview is different in kind from the materials listed in Rule 7(b).

Love's attempt to make the transcript part of the record two months after the evidentiary hearing is inconsistent with the standards for expanding the record. In *Cooper–Smith v. Palmateer,* 397 F.3d 1236, 1241–42 (9th Cir.2005), the court held that to expand the record without an evidentiary hearing, a habeas petitioner must comply with the diligence requirement in § 2254(e)(2). Neither case law, AEDPA, nor Rule 7 set a standard for expanding the record after an evidentiary hearing has closed. Nevertheless, the diligence requirement that permeates AEDPA will be applied here.

Petitioner was not diligent in seeking to expand the record after the close of evidence. The Baker interview transcript is not the type of post-evidentiary hearing material for which Rule 7 is suited. The interview was tape recorded and does not appear to have been given under oath. (Tr. Evidentiary Hr'g 35–36.) The transcript is not signed, was not reviewed, and the question-and-answer session took place long after the filing of Love's habeas Petition. The content of the interview is not especially important or probative and does little to "clarify the relevant facts." *See Vasquez v. Hillery,* 474 U.S. 254, 258, 106

S.Ct. 617, 88 L.Ed.2d 598 (1986) (citation omitted). For all these reasons, Love's request to expand the record to include the Baker interview transcript is denied, and Respondent's Motion to Strike Exhibit B to Petitioner's Post–Hearing Legal Brief is **GRANTED.**

## C. *The Batson Challenge*

■ The Equal Protection Clause of the Fourteenth Amendment prevents a prosecutor from purposefully excluding potential jurors on the basis of racial identity. *Batson,* 476 U.S. at 85–88, 106 S.Ct. 1712. "[T]he 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Williams v. Runnels,* 432 F.3d 1102, 1107 (9th Cir.2006) (quoting *United States v. Vasquez–Lopez,* 22 F.3d 900, 902 (9th Cir.1994)). "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson v. California,* 545 U.S. 162, 172, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (citation omitted).

■ The prosecutor has the burden of producing a race-neutral reason for the challenged strike. *Kesser v. Cambra,* 465 F.3d at 359 (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712; *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)). The proffered explanation need not be "persuasive, or even plausible" to be race-neutral. *Purkett,* 514 U.S. at 767–68, 115 S.Ct. 1769. The reason must, however, be "related to the particular case to be tried." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712 (footnote omitted). Notably, "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller–El v. Dretke,* 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). "[W]hen illegitimate grounds like race are in issue, a prosecutor simply

has got to state his reasons ·as best he can and stand or fall on the plausibility of the reasons he gives." *Id.*

■ The Court may not substitute its reasoning to satisfy the prosecutor's burden at step two of a *Batson* analysis. *Id.* Baker's statement to the trial court was categorical: "Teachers and social workers don't sit on the jury." (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 371.)

### 1. Proving Purposeful Discrimination at Step Three

■ At step three of the *Batson* inquiry, the question is "whether the opponent of the strike has proved purposeful racial discrimination." *Johnson,* 545 U.S. at 168, 125 S.Ct. 2410 (citing *Purkett v. Elem,* 514 U.S. at 767, 115 S.Ct. 1769). The ultimate burden of persuasion regarding racial motivation "rests with, and never shifts from, the opponent of the strike." *Id.* at 171, 125 S.Ct. 2410 (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769). Thus, Petitioner Love has the burden of proving purposeful discrimination. *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

The burden, however, is not a heavy one. Love must establish "purposeful discrimination by a preponderance of the evidence." *Paulino II,* 542 F.3d at 703; *accord Hardcastle v. Horn,* 521 F.Supp.2d 388, 401 (E.D.Pa.2007).

■ In deciding whether Petitioner has carried his burden, the Court must "assess the plausibility of [the prosecutor's reason for striking the challenged juror] in light of all evidence with a bearing on it." *Miller–El v. Dretke,* 545 U.S. at 252, 125 S.Ct. 2317 (citations omitted). The prosecutor may not "rebut the [Petitioner's] case merely by denying that he had a discriminatory motive or 'affirm[ing][his] good faith in making individual selections.'" *Batson,* 476 U.S. at 98, 106 S.Ct. 1712 (quoting *Alexander v. Louisiana,* 405

U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). The Court considers whether the reasons advanced by the prosecutor are "pretextual," and the conclusion "'largely will· turn on evaluation of credibility.'" *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (quoting *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712).

■ As the Supreme Court noted, "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* "[A] finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)); *accord Paulino II,* 542 F.3d at 699 (stating that "purposeful discrimination" raises a question of fact).

### a. The Evidentiary Hearing

The evidentiary hearing in this case took place on March 12, 2009. Baker had excused McGee from the jury over five and one-half years earlier, on July 21, 2003. Before and after Love's trial, Baker tried many other cases. (Tr. Evidentiary Hr'g 32–33.) He acknowledged that it was "very tough to remember the details [of Love's trial]." (*Id.* at 34.) "I'm trying to go on exactly what I recall and what refreshes my recollection with the caveat … it's difficult not to insert your common practice and things like that and assume that happened. And I'm endeavoring not to do that." (*Id.* at 37.)

Baker described his general guidelines for selecting jurors. (*Id.* at 5–13.) But he did not independently recall his reasons for striking McGee from the jury. (*Id.* at 37.) He was able to recall the reason for the peremptory challenge only because he consulted the transcripts of the state trial

proceedings. (*Id.*) At the trial, Baker had the juror notes taken by his predecessor, but at the evidentiary hearing, he did not remember what information was noted for each potential juror. (*Id.* at 52–53.) Baker was careful not to overstate what he actually recalled of July 21, 2003. As a result, his testimony did not significantly alter the state court record.

■■■ A memory lapse or the failure to recall the details of jury voir dire is not determinative. *See Gonzalez v. Brown,* 585 F.3d at 1210–11. In *Gonzalez,* the Ninth Circuit explained:

> The prosecutor's failure to give a valid and race-neutral reason for her peremptory strike of the first juror [because "she simply could not remember why she had excused the first juror"] weighs against her in an assessment of her motive, but that is not all that was before the state trial court and it had other good reasons to conclude there was not purposeful discrimination.

*Id.* The *Gonzalez* court, *id.* at 1210, noted that in Yee, 463 F.3d 893, the Ninth Circuit "revers[ed] the grant of habeas on AEDPA standard of review where [the] prosecutor could not recall why she had stricken one juror." Later, in *Paulino II,* it "affirm[ed] the grant of habeas on de novo review where the prosecutor could not recall why she had stricken *any* of the African–American jurors." *Id.* Baker's inability to reconstruct his reasons for striking McGee and not striking others may undermine Respondent's argument, but it is not fatal.

Petitioner argues that "[i]n light of the manifest deficiencies in Baker's ability to recall and report accurately the details surrounding the *Batson* challenge, the Court must treat his testimony as to historical facts as deserving no weight, as in *Paulino.*" (Pet'r's Post–Hr'g Br. 12); *see Paulino II,* 542 F.3d at 701 (stating that at step two of a *Batson* analysis, the prosecu-

tor's speculation was not circumstantial evidence of her actual reasons for striking African–Americans).

Respondent concedes that Baker did not remember some aspects of Love's trial, but he argues that during the evidentiary hearing, Baker remembered striking McGee because of her occupation and not because of her race. (Post–Evidentiary Hr'g Reply Br. 3–4.) Respondent distinguishes Love's case from *Paulino.* He argues that during the state court proceedings, the prosecutor in *Paulino* was never asked for an explanation for her strikes; she had no independent or refreshed memory of voir dire; and the state failed carry its burden at stage two to produce a race-neutral reason for the strikes. (*Id.* at 2–3.) Counsel concludes, "The most striking distinction with *Paulino* is that here the state satisfied its burden of production at *Batson's* stage two by providing a race-neutral reason for excusing Ms. M[cGee]—her occupation as an eligibility worker." (*Id.* at 3.)

Baker gave the trial judge a single, race-neutral reason for his challenge to McGee; and during the evidentiary hearing, the prosecutor recalled that he struck McGee because of her occupation. (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 371; Tr. Evidentiary Hr'g 25, 56, 73, 77, 81.)

During Love's *Wheeler/Batson* challenge at the close of voir dire, Judge Jones told Love that "the employment background of Ms. McGee I find would be a reasonable explanation. . . ." (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. at 373.) The judge understood the sole reason for striking McGee was her occupation, and Baker did not correct him or state that there were additional factors. The trial judge was not clairvoyant; he could only have found the prosecutor's reason for striking McGee to be what Baker explained.

During the evidentiary hearing, Baker explained that he would merely have some concerns over jurors who were teachers or social workers. (Tr. Evidentiary Hr'g 7, 9.) He did not have a general rule that a teacher or social worker would never sit on a jury. (*Id.* at 10.) The prosecutor said there are a "myriad of intangibles" that are involved in juror selection, and his aversion to teachers and social workers was more a "guideline" or "rule of thumb." (*Id.* at 7–8; *see also id.* at 10, 59, 61–62, 71–72.)

When asked whether he considered teachers or social workers "negative prosecution jurors," Baker responded that he would not "put it that strongly." (*Id.* at 9.) The prosecutor testified that his categorical statement in Love's case was hyperbole. (*Id.* at 26.) Baker explained that there are no "blanket rules in jury selection." (*Id.* at 72.)

Not surprisingly, Baker was asked, "Did you strike her [McGee] because she was an African–American?" His answer was "no." (*Id.* at 25.) He was also asked, "Did her being an African–American in any way play into your decision to strike her?" (*Id.*) Baker responded, "Of course not." (*Id.*) The prosecutor's denial of any discriminatory motive for striking the only African–American on the jury is welcomed, but only goes so far. It is not enough to rebut Petitioner's case. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

Respondent argues that Baker had another reason for striking McGee. (Post–Evidentiary Hr'g Opening Br. 6–7.) He contends that Baker had been a prosecutor on a different case in which a teacher or social worker expressed disapproval of the state pursuing a case against a person who was already incarcerated. (*Id.*) The Respondent implies that because Love was incarcerated at the time of his trial, Baker was concerned about a similar reaction. (*Id.*)

The prosecutor's testimony was not that precise. He did not recall whether a social worker, teacher, law enforcement officer, or someone in another occupation made the comment that prosecuting those already in prison was a waste of money when government employees were getting pink slips. (Tr. Evidentiary Hr'g 63.) Baker never stated that this negative experience occurred before Love's case or that he considered this experience when he challenged McGee. (*Id.* at 8, 63–65.) Arguably, he addressed wasting financial resources when he asked the potential jurors if anyone "felt uncomfortable that this happened in state prison?" (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 366.) Baker's anecdote is too general to conclude that it had any bearing on striking McGee from the jury.

At the federal evidentiary hearing, Baker did not remember any reason for striking McGee, other than her occupation. Additional reasons offered by Respondent are speculative and, at step three, cannot supplement the explanation Baker stated for excusing McGee from the jury. *See Paulino II,* 542 F.3d at 700 (citations omitted). The prosecutor's challenge will stand or fall on the single, race-neutral reason he gave the trial judge and circumstantial evidence. *See Miller–El,* 545 U.S. at 252, 125 S.Ct. 2317.

**b. Direct or Circumstantial Evidence**

■ "Evidence of a prosecutor's actual reasons [for striking a juror] may be direct or circumstantial, but mere speculation is insufficient." *Paulino II,* 542 F.3d at 700 (citations omitted). "[C]ircumstantial evidence is a set of facts from which another fact may be inferred, as opposed to direct evidence, which goes directly to the fact to be established." *Id.* at 700 n. 6. "[D]irect evidence of the prosecutor's discriminatory intent will often be hard to produce." *Wil-*

*son v. Beard,* 426 F.3d 653, 670 n. 18 (3d Cir.2005) (citation omitted).

In *Miller–El,* 545 U.S. at 241, 125 S.Ct. 2317, the Supreme Court cited *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), with approval, for the proposition that proof that an "explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive[.]" "A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination." *Turner v. Marshall,* 121 F.3d 1248, 1251–52 (9th Cir.1997). "Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised." *McClain v. Prunty,* 217 F.3d 1209, 1221 (9th Cir.2000) (citing *Caldwell v. Maloney,* 159 F.3d 639, 651 (1st Cir. 1998)); *Johnson v. Vasquez,* 3 F.3d 1327, 1331 (9th Cir.1993). "The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason." *McClain, id.* (citing *United States v. Chinchilla,* 874 F.2d 695, 699 (9th Cir.1989)).

The prosecutor told the trial judge that he struck McGee because "she's a social worker and eligibility worker.... Teachers and social workers don't sit on the jury.... They are not favorable jurors to the prosecution." (J. Mot. File Tr. State Proceedings, Attach. #2 Tr. 371–72.) McGee was an eligibility worker, which was within Baker's definition of social worker. The race-neutral reason for striking McGee did not distinguish teachers from social workers. Likewise, at the evidentiary hearing, Baker did not distinguish between the two. (Tr. Evidentiary Hr'g 2–82.) He testified that both tend to be

"sympathetic people," and "their perspective is rehabilitative." (*Id.* at 7.)

The Court must consider whether a comparative analysis of jurors should be limited to teachers and social workers, because those were the disfavored occupations cited by the prosecutor, or whether "teacher" should include instructional assistants and teacher's aides.

In *Love v. Scribner,* the court observed:

The prosecutor's stated reason applied to both teachers and social workers. Once again, where, as here, the prosecutor's stated reason does not hold up, "[i]ts pretextual significance does not fade," because an appellate judge, looking at the record, can construct a different rationale, here an antipathy toward social workers but not teachers.

*Love,* 278 Fed.Appx. at 718 (quoting *Miller–El,* 545 U.S. at 252, 125 S.Ct. 2317).

The Ninth Circuit found fault with the state court analysis:

Hypothesizing that the "decision to retain the three teaching-connected jurors may well have been motivated by countervailing factors in their background that ameliorated concerns about their potential antipathy," the California appellate court noted that each of the teaching-connected individuals still on the jury was "older," and that two of them were married to individuals "whose occupations ... perhaps suggest a more conservative outlook."

Such speculation does not comply with the requirement that a court considering a *Batson* challenge compare what the prosecution said in explanation of its peremptory challenges with what it actually did.

*Id.* at 717.

In the order remanding this case for an evidentiary hearing, the district court was directed to conduct a comparative analysis

of McGee and the teaching-connected individuals who served on the jury. *Id.* at 718. Love contends that the Court must define the term "teacher" broadly because the law of the case doctrine compels it. (Pet'r's Post–Hr'g Br. 5 (*citing Love v. Scribner,* 278 Fed.Appx. at 717 n. 1).)

Respondent counters that "[w]hether or not Mr. Baker considered [jurors with teaching-related jobs as being] teachers is not a binding legal issue that the Ninth Circuit has already decided." (Post–Evidentiary Hr'g Reply Br. 10.) He argues that a determination that those jurors are similarly situated to McGee has not been made. (*Id.*)

As discussed earlier, the mandate rule precludes reconsidering an issue that has already been decided by the same or a higher court. *See United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997) (quoting *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.1993)). In Love's case, the Ninth Circuit explained, "[T]he prosecution appears to have defined the term 'social worker' broadly to include eligibility workers. This calls for a broad interpretation of the term 'teacher' to include instructional assistants and teacher's aides." *Love v. Scribner,* 278 Fed.Appx. at 717 n. 1. The case was remanded because the record did not "provide an adequate basis for determining *de novo* whether the real reason the prosecutor struck Ms. M. was her race.... [T]he trial court did not allow Love to examine the prosecutor's actual reasons for keeping the teaching-connected individuals, while striking Ms. M. from the jury." *Id.* at 718.

■ Not every statement in the Ninth Circuit opinion is law of the case or subject to the rule of mandate. "For the [law of the case] doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." *Rebel Oil Co. v. Atl. Richfield Co.,* 146 F.3d 1088, 1093 (9th Cir.

1998). "An issue was decided implicitly when its resolution "was a necessary step in resolving the earlier appeal" ... [and was] so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated." *In re Meridian Reserve, Inc.,* 87 F.3d 406, 409–10 (10th Cir. 1996) (*quoting Guidry v. Sheet Metal Workers Int'l Ass'n,* 10 F.3d 700, 707 (10th Cir.1993) (footnote omitted)).

■ General remarks by the appellate court about a broader issue not necessary to the result are dicta. *See Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 716 (9th Cir.1990); *Arcam Pharm. Corp. v. Faria,* 513 F.3d 1, 3 (1st Cir.2007) (commenting that dicta are "observations in a judicial opinion or order that are 'not essential' to the determination of the legal questions then before the court[ ]") (quoting *Municipality of San Juan v. Rullan,* 318 F.3d 26, 29 n. 3 (1st Cir.2003)). Dicta have no preclusive effect and are not law of the case. *Rebel Oil Co.,* 146 F.3d at 1093.

When making its juror comparisons, neither the law of the case doctrine nor the rule of mandate requires the Court to consider instructional assistants and teacher's aides to be teachers. The prosecutor's stated race-neutral explanation is the touchstone. Even so, a comparison between McGee and each juror with a teaching-related career is instructive. Prosecutor Baker acknowledged that the distinction between teachers, instructional assistants, and teacher's aides was not one of kind, but of degree. (Tr. Evidentiary Hr'g 56–58.)

### c. Comparative Analysis

■ In *Miller–El,* 545 U.S. at 241, 125 S.Ct. 2317, the Court endorsed using a comparative analysis to review striking some jurors and not others. "If a prosecutor's proffered reason for striking a black

panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. at 147, 120 S.Ct. 2097). A "side-by-side comparison" is made of the African-American who was stricken from the panel with others allowed to serve. *Id.* For a comparative analysis to be useful, the compared jurors must be similarly situated. *Mitleider v. Hall,* 391 F.3d 1039, 1049 n. 9, 1050 (9th Cir.2004).

Juror four, Ramirez, and McGee were among the potential jurors who already had participated in judicial voir dire, been questioned by Kowalski, and were seated in the jury box when Baker took over Love's case. (J. Mot. File Tr. State Proceedings, Attach. # 1 Tr. 176, 264, 291–93.) Respondent explains that there is "no evidence" that Baker was aware of the potential jurors' biographical information unless he was present during their voir dire. *See* (Post–Evidentiary Hr'g Opening Br. 9.) Yet, he was present for the court's voir dire of jurors eight and ten, the alternate, and others on the jury. (*See* J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 349–63.)

Baker relied on prosecutor Kowalski's notes in deciding whom to strike. (Tr. Evidentiary Hr'g 21, 25.) At trial, he told the court that he "referred to Chris Kowalski's notes who was [at the] original voir dire." (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 371.) The notes, however, were never recovered; and at the evidentiary hearing, Baker could not recall what information was on the notes, other than the challenged jurors' occupations. (Tr. Evidentiary Hr'g 16–18, 21–23, 38–39, 52–55, 75.) At trial, Baker explained to the trial judge why he struck McGee from the jury. "It appears she was an eligibility worker." (J. Mot. File Tr. State Proceed-

ings, Attach. # 2 Tr. 371.) "I excused both of those [prospective jurors McGee and Ramirez] that I believed to be that [social workers]." (*Id.*)

Petitioner argues, "As the [Kowalski] notes are missing, and Baker can recall nothing about the format or content of the notes, the safest course is to assume that all the information in the record was accurately reported in the notes and Baker duly informed himself of those few facts he had available to him." (Opp'n Mot. Strike & Surreply 6.) Whether by the Respondent or Petitioner, speculation about the prosecutor's knowledge or motive is not circumstantial evidence of the absence or existence of discriminating intent. *See Paulino II,* 542 F.3d at 700.

Because Kowalski's notes are missing and Baker was not present for the entire voir dire, the Court cannot attribute to him complete knowledge of what each potential juror disclosed. The prosecutor's limited recall hampers his ability to explain what appears to be a racially-motivated peremptory strike. This shortcoming is another of the many relevant facts to be considered. *See Kesser,* 465 F.3d at 359 (citing *Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859).

### i. McGee and Juror Ten—The Teacher

 McGee was an eligibility worker; juror ten was a school teacher. Love contends that from the prosecution's view, juror ten and McGee each held a disfavored occupation, and this is "the crucial similarity for purposes of this case." (Pet'r's Post–Hr'g Br. 17 (emphasis omitted).)

Respondent acknowledges that juror ten was a school teacher, "[t]herefore, she had one characteristic that the prosecutor disfavored, similar to Ms. M[cGee]." (Post–Evidentiary Hr'g Opening Br. 9.) Respondent distinguishes the two by explaining that juror ten had "very conservative, pro-

prosecution aspects of her background that Ms. M[cGee] lacked." (*Id.* at 10.) Namely, her ex-husband was a farmer, and McGee's spouse was an electrician. (*Id.*) Juror ten was a resident of Holtville, which was "a very conservative, small town," and McGee did not state where she resided. (*Id.*) According to Respondent, the meaningful difference between juror ten and McGee was that juror ten "had close connections to the local agricultural community." (Post–Evidentiary Hr'g Reply Br. 11.)

Baker's peremptory strike of McGee must "stand or fall on the plausibility of the reasons he [gave]." *Miller–El,* 545 U.S. at 252, 125 S.Ct. 2317. "Teachers and social workers don't sit on the jury." (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 371.) Even so, he struck the social worker and did not strike the teacher. "An inference of discrimination may arise when two or more potential jurors share the same relevant attributes but the prosecutor has challenged only the minority juror." *United States v. Collins,* 551 F.3d 914, 922 (9th Cir.2009). Thus, pretext is shown because Baker's stated reason applied equally to juror ten, who was not African–American. She was permitted to serve on the jury but McGee was not. *See Miller–El,* 545 U.S. at 241, 125 S.Ct. 2317.

Respondent argues there were additional pro-prosecution factors that caused Baker to strike McGee and not strike juror ten. (Post–Evidentiary Hr'g Reply Br. 11–12, 14.) Although this may be true, Baker did not actually remember any reasons for leaving a teacher, juror ten, on the jury. (Tr. Evidentiary Hr'g 28–29.) He was present during the court's voir dire, when she identified herself as a teacher. (*Id.* at 29.) She also described her ex-husband as a farmer, stated that she lived in Holtville, and was a juror in a criminal case fifteen years earlier. (J. Mot. File Tr. State Proceedings, Attach.

# 2 Tr. 351.) Baker stated that "Holtville farming families are extremely conservative and tend to be friendly prosecution jurors." (Tr. Evidentiary Hr'g 30.) He preferred jurors who "had prior jury experience where the jury was able to reach a verdict so they can be decisive." (*Id.* at 6.)

Still, the prosecutor did not recall why he left a teacher on the jury, and counsel's attempt to refresh his recollection was unsuccessful. (*Id.* at 28–29.) "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller–El,* 545 U.S. at 252, 125 S.Ct. 2317. The Court is precluded from speculating about Baker's actual reasons for allowing juror ten to serve while striking McGee. Because the prosecutor did not apply his race-neutral reason to a similarly-situated individual who was not African–American, his explanation is not credible. *McClain,* 217 F.3d at 1220–21.

### ii. McGee and Juror Eight— The Teacher's Aide

■ Baker was present during the judicial voir dire of juror eight. She was married, had one grandchild, was employed as a "teacher's aide," and had served on a jury ten to twelve years earlier, but she could not recall whether it was a civil or criminal case. (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 352.) Her husband was a retired cowboy from a feed lot. (*Id.*)

Baker testified that a teacher's aide would be less of a concern than an elementary school teacher. (Tr. Evidentiary Hr'g 31.) Juror eight was a grandmother and her husband's ties to the agricultural and stockyard communities could be positive factors. (*Id.*)

Again, the prosecutor did not recall why he kept juror eight on the panel but excused McGee. At best, he speculated about how her occupation "would have struck [him]." (*Id.*) Her husband's former

occupation and that she was a grandmother "could be" positive factors. *Id.* Like the prosecutor in *Paulino II*, Baker "did nothing more than guess why [he] might have removed [or kept] the jurors in question." *Paulino II*, 542 F.3d at 700. The failure to articulate a reason for striking McGee but not striking others with a disfavored occupation is evidence of purposeful discrimination.

### iii. McGee and Juror Four—The Instructional Assistant

█ Juror four was examined by the court while Kowalski was present. She disclosed that she was married with three children, had one grandchild, worked as an "instructional assistant" and had no prior jury experience. (J. Mot. File Tr. State Proceedings, Attach. # 1 Tr. 176.) Her husband was a maintenance worker, and on that day, she was "on vacation." (*Id.*)

Prosecutor Baker did not recall any information about juror number four. (Tr. Evidentiary Hr'g 27–28.) He offered no reason for keeping her—the instructional aide—but striking McGee. (*Id.*) Baker conceded that the difference between a teacher and instructional assistant is one of degree. (*Id.* at 56–58.) The failure to excuse juror four supports the inference that challenging the only African–American was racially motivated.

### iv. McGee and Juror Six—The Student

█ Petitioner briefly argues that "Juror 6, may be considered to have an indirect educational connection through her husband, as well as being perhaps a recent education student." (Pet'r's Post–Hr'g Br. 5 n. 6.) Love is correct that jurors subject to a comparative analysis are not required to have all the same characteristics to be similarly situated. (*Id.* at 16); *see Green v. La Marque*, 532 F.3d 1028, 1030 n. 3 (9th Cir.2008).

Nevertheless, he overstates his claim for including juror six in a comparison of McGee and all teaching-connected individuals. Juror six had just graduated from San Diego State University in May of 2003; she had no prior jury experience; and her husband was an "admission representative" for a technical school in Phoenix. (J. Mot. File Tr. State Proceedings, Attach. # 1 Tr. 269.) She had some friends who were local correctional officers. (*Id.* at 285.)

Juror six is not similarly situated to the other jurors who are the subject of this comparative analysis. Her occupation can best be described as an unemployed, recent college graduate. Because she is not a comparable juror, the failure to strike her from the jury is not probative of Baker's intent. *See Mitleider v. Hall*, 391 F.3d at 1049 n. 9, 1050.

### v. McGee and Ramirez—The Social Security Employee

█ Love also contends that Baker's testimony at the evidentiary hearing contradicted the explanation he provided to the trial judge regarding striking social workers. (Pet'r's Post–Hr'g Br. 12.) Petitioner states that the prosecutor claimed to have excused "both" jurors he considered to be social workers, referring to McGee, an eligibility worker, and Ramirez, an employee at the Social Security office. (*Id.* at 13.) Love claims that Baker "deliberately misrepresented the scope of his 'rule of thumb' to Judge Jones in responding to the *Batson/Wheeler* objection ... [to] create[ ] an impression of consistency which he knew was false." (*Id.; see also* Opp'n Mot. Strike & Surreply 6.)

Respondent asserts that any perceived discrepancy between Baker's explanation at trial and his testimony at the evidentiary hearing is the result of Baker's reliance on the previous prosecutor's notes. (Post–Evidentiary Hr'g Reply Br. 7.) Baker was not present when Ramirez was questioned by the court. (*Id.*) Although Kowalski's

notes have not been located, Respondent argues, "Mr. Baker understood at the time of trial that Mr. Ramirez was a social worker and that is why he chose to exercise a peremptory challenge against him." (*Id.*)

At the evidentiary hearing, Baker explained that he did not consider a person who worked at the Social Security office to be a social worker. (Tr. Evidentiary Hr'g 58.) He did not recall whether, in addition to McGee, he challenged any other juror who was a social worker. (*Id.* at 26–27.)

A comparison of the race-neutral reason the prosecutor gave in defense of his strike of McGee with his predecessor's voir dire notes may be useful to show Baker's representation was a pretense. *See Johnson v. Vasquez,* 3 F.3d at 1330 (comparing prosecutor's testimony with his notes on a "jury panel scratch sheet"). But here, the Court only has Baker's statement to the trial judge and his testimony at the evidentiary hearing to consider. The notes taken by Baker's predecessor are not available. Of course, working at the Social Security office and being an eligibility worker are not necessarily synonymous. What matters is that Baker thought the two individuals were similarly situated.

The Court observed Baker's demeanor during the evidentiary hearing. He went to great lengths not to overstate the prosecution's case for dismissing juror McGee. Based on his demeanor, his last-minute entrance into the case, and that he was not in attendance when Ramirez was examined, the Court cannot attribute to Baker the intent to deceive that Love suggests. The statement that the prosecutor excused both that he perceived to be social workers has little effect on this comparative analysis.

###### vi. Alternate Juror Selection— The Teacher

Courts often consider the selection of alternate jurors when performing a comparative analysis. *See United States v. Collins,* 551 F.3d at 921 n. 2 (noting an African–American alternate juror was struck for cause); *Green v. LaMarque,* 532 F.3d at 1033 (comparing the manner in which the prosecutor questioned possible jurors including an alternate); *see also Johnson v. California,* 545 U.S. at 165, 125 S.Ct. 2410 (considering the composition of the jury including alternates); *Ford v. Georgia,* 498 U.S. 411, 415, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (considering defendant's challenge of an alternate juror); *Kesser v. Cambra,* 465 F.3d at 354 (same). Likewise, this Court will include alternate selection in its comparative analysis.

■ Respondent argues that striking the alternate was not comparable to striking McGee. (Post–Evidentiary Hr'g Opening Br. 10.) Garibay, the first prospective alternate, was a teacher, but Baker chose to strike Noris, the second possible alternate, who "was single, had no children, had no prior jury experience, and was a student...." (*Id.* at 11.) Baker explained at the evidentiary hearing that he disfavored young student jurors. (Tr. Evidentiary Hr'g 11, 13.) He testified that when selecting jurors, he looks at "[w]ho else is on the panel[;][w]ho's coming up next." (*Id.* at 7.) But when asked why he accepted Garibay, the teacher, as an alternative, Baker candidly admitted, "I would have guessed I would have struck her." (*Id.* at 78.) "There may be other reasons I didn't." (*Id.* at 79.) "I don't recall why I did [not challenge the teacher as an alternate]." (*Id.*)

Respondent theorizes that because Baker only had one challenge to use on the possible alternates he "had to decide which of these [first two potential alternate] jurors he favored more." (Post–Hr'g Opening Brief 11.) The prosecutor "chose [the teacher], whose biographical information indicated more life experience than [the

student]." (*Id.*) "Had Mr. Baker struck Ms. Garibay he would have necessarily been selecting the next option, Mr. Noris, because Mr. Baker only had one challenge to exercise." (Post–Evidentiary Hr'g Reply Br. 13.)

Petitioner counters that the "more plausible [explanation] is the simple observation that the 'teacher/social worker' criterion had no bearing at all on [Baker's] selection conduct." (Pet'r's Post-Hr'g Br. 6.) Love explains, "It is incongruent that Baker would pass over a professed member of the target occupation and then remove a non-member, faced with a significant chance the final alternate would also be a teacher." (*Id.*)

Nonetheless, the Respondent's argument makes sense. It is, however, not what Baker described under oath. The prosecutor offered no explanation why he did not challenge the teacher as an alternate. Baker could recall no reason. Respondent's speculation is no substitute for testimony as to Baker's actual reasons. *See Paulino II*, 542 F.3d at 700.

Love observes that Baker was not consistent because during jury selection, he excused a juror based on occupation before he excused a juror based on youth, and during alternate selection, he used his only strike to excuse a juror based on youth rather than excusing a juror based on occupation. (Opp'n Mot. Strike & Surreply 7.) Petitioner claims that this shows that the " 'rule of thumb' was not being applied[.]" (*Id.*)

Baker described the general principles he applies to voir dire and claimed that he applied those principals in Love's case. (Tr. Evidentiary Hr'g 76.) He agreed that it was fair to say that Love's case "was not [his] typical voir dire style." (*Id.* at 20.) He spent less time than usual on voir dire; he had less time to plan for trial; and he was essentially engaged in "damage control." (*Id.* at 44; *see also id.* at 62.)

When asked whether his handling of Love's case was consistent with how he would normally conduct a case, Baker answered, "Oh, no." (*Id.* at 44–45.)

At the evidentiary hearing, the prosecutor explained that occupation is just one of many factors that he considers. (*Id.* at 7–10, 26, 59, 61–62, 71–74.) Conversely, when he spoke of his strike of McGee, he stated that occupation alone was sufficient to strike her. (*Id.* at 81.)

Baker was present when alternate juror Garibay disclosed she was a teacher. He asked her no questions. He had the opportunity to strike her but chose not to. This is not consistent with the prosecutor's explanation that one's occupation as a teacher was sufficient for him to exercise a strike. Baker does not recall why he accepted Garibay as an alternate. The uneven application of his general principles to the selection of an alternate is additional evidence of pretext. The prosecutor's willingness to apply his general principles and personal preferences categorically to McGee, but use them sparingly when considering others, is evidence of a race-based motivation. *McClain*, 217 F.3d at 1221.

#### d. Other Factors

#### i. Questioning of Jurors

On occasion, the manner in which the prosecutor questions potential jurors will aid the Court's determination of whether the race-neutral explanation was pretextual.

In *Miller–El*, 545 U.S. at 255, 125 S.Ct. 2317, the Court compared the prosecutor's questioning of black and nonblack prospective jurors. It concluded that disparate questioning of black jurors with a script designed to elicit some hesitation to consider the death penalty was evidence of purposeful racial discrimination. Whether a potential juror is questioned may also be probative. *See United States v. Collins*,

551 F.3d at 922; *United States v. Esparza–Gonzalez,* 422 F.3d 897, 904–05 (9th Cir.2005); *Fernandez v. Roe,* 286 F.3d 1073, 1079 (9th Cir.2002).

In *Collins,* the Ninth Circuit noted that "the prosecutor did not pursue further questioning before striking the only remaining African–American panel member." *United States v. Collins,* 551 F.3d at 922 (citing *United States v. Esparza–Gonzalez,* 422 F.3d at 905). The problem is that the prosecutor may have "very little hard information to base this decision [to strike a juror] on." *Id.* (quoting *Esparza–Gonzalez,* 422 F.3d at 905). "Although the prosecutor has no obligation to question all potential jurors, his failure to do so prior to effectively removing a juror of a cognizable group ... may contribute to a suspicion that this juror was removed on the basis of race." *Esparza–Gonzalez,* 422 F.3d at 905; *see also Fernandez v. Roe,* 286 F.3d at 1079 (noting that "the prosecutor failed to engage in meaningful questioning of any of the minority jurors[ ]").

 Respondent argues that "Mr. Baker treated the jurors identically during questioning." (Post–Evidentiary Hr'g Opening Br. 12; *see also* Post–Evidentiary Hr'g Reply Br. 8.) Baker asked questions of the panel as a whole and asked only one direct question to a juror and asked no questions regarding any juror's biographical information. (J. Mot. File Tr. State Proceedings, Attach. # 2 Tr. 364–66.) He explained that voir dire was unusual because Kowalski had already questioned most of the jurors, and he did not feel comfortable questioning them again. (Tr. Evidentiary Hr'g 19–20.) His recollection is not entirely correct. As Petitioner correctly points out, six of the twelve seated jurors and the alternate were questioned during the second day of jury selection. (Pet'r's Post–Hr'g Br. 9; *see* J. Mot. Copy Tr. State Proceedings, Attach. # 2 Tr. 348–63.)

Petitioner asserts that Baker's assertion that he was pressed for time or had an insufficient opportunity to question jurors fails because he was given twenty minutes for questioning but only asked five questions. (Pet'r's Post–Hr'g Br. 8.)

Baker described the difficulties he encountered. (Tr. Evidentiary Hr'g 20.) He didn't have an opportunity to talk to the prosecutor who conducted the first day of jury selection. (*Id.*) He hadn't prepared an opening statement; he hadn't read the prison incident reports. (*Id.*) "[I]t wasn't a typical trial. It was kind of a mess." (*Id.*) Baker's entrance into this case midway through voir dire and one hour before giving an opening statement was an unusual circumstance. Nonetheless, he knew McGee's occupation, and he knew that juror ten was a teacher; juror eight was a teacher's aide; and juror four was an instructional assistant. Baker was an experienced prosecutor; he was familiar with *Batson* and understood the significance of striking the only African–American from the jury. (Tr. Evidentiary Hr'g 2–4.) Under these circumstances, his failure to question McGee is suspect.

### ii. Pattern of Strikes

 Petitioner contends that the prosecutor's use of his first strike to excuse the only African–American in the jury box is evidence of pretext. (Pet'r's Post–Hr'g Br. 4.) Love argues that the prosecutor challenged McGee before Ramirez, whom Love feels was a better candidate for a strike by the prosecutor. (*Id.* at 4–5.) Additionally, if Baker disfavored "youthful inexperience" he would have stricken Duron, a single, childless, recent community college graduate, before he struck McGee. (*Id.* at 18.)

Respondent acknowledges that McGee was the first juror challenged by Baker, but this was followed by challenges to the worker at the Social Security office, a stu-

dent, and a tow operator. (Post–Evidentiary Hr'g Opening Br. 3.) Respondent speculates that Baker used his first strike against McGee because she was the first juror in the jury box. (Post–Evidentiary Hr'g Reply Br. 8.) And "there is no requirement that the prosecution excuse jurors in the order that [he] disfavors them." (*Id.*)

The order in which jurors are stricken may assist in deciding whether a challenged strike was based on racial discrimination. *See United States v. Chinchilla*, 874 F.2d at 698 (noting that government used its first peremptory challenge to strike the only Hispanic). But that analysis is not particularly useful here because there was only one African–American on the jury, and she was the first person seated in the jury box. There is not enough evidence for the Court to determine whether striking McGee first is evidence of pretext or simply the result of her being in the first seat. Thus, the Court affords this argument little weight.

### III. CONCLUSION

Baker's categorical explanation for striking McGee—teachers and social workers don't sit on the jury—was not consistently applied. He challenged McGee but permitted non-African-Americans to serve on the jury. Alternatively, if being a teacher or social worker was only one of many factors the prosecutor generally considered, Baker was unable to articulate any additional reasons he had for challenging McGee. He did not identify any of his guidelines as the actual reason for challenging her or not challenging others. The prosecutor simply did not recall what he had done five and one-half years earlier. In Love's case, additional reasons did not come from Baker, but from Respondent's counsel. Her speculation is not entitled to any weight. The evidence indicates that the peremptory strike was racially motivated.

On July 21, 2003, Baker struck the only African–American seated on the jury to try this African–American defendant. Love has proven, by a preponderance of the evidence, that the prosecutor did not strike McGee from the jury simply because she was an eligibility worker. The circumstances of that peremptory strike, Baker's inability to articulate a credible explanation for the strike, and a comparative analysis of McGee and jurors who were permitted to serve are sufficient to conclude that Baker used a peremptory challenge to eliminate McGee from the jury because she was African–American. The prosecutor's strike violated the Equal Protection Clause as described in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Court recommends that unless Love is retried within a reasonable period to be set by the district court, his Petition for Writ of Habeas Corpus be **GRANTED.**

This Report and Recommendation will be submitted to United States District Court Judge William Q. Hayes, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the district court and serve a copy on all parties on or before *December 18, 2009.* The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before January 8, 2010. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir.1991).

**IT IS SO ORDERED.**

Date: November 30, 2009.